UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WALTER GIBBS, | Date Filed: |
| Plaintiff, | Civil Action No.: 3:05CV563 (MRK) |
| v. | |
| AMERICAN SCHOOL FOR THE DEAF, | ***JURY TRIAL*** |
| Defendant. | ***DEMANDED*** |

## COMPLAINT

1. This is an action for injunctive relief and damages to redress defendant's discrimination, civil rights deprivations and retaliation against the Plaintiff because of his race (black), color (black) and physical disability (deafness), in violation of the following statutes and acts: C.G.S. §46a-58(a); C.G.S. §46a-60(a)(1) and (4); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §20003 and the Civil Rights Act of 1991, and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*; *et al.* The Plaintiff seeks reinstatement to his position as Community Inclusion Specialist with the American School for the Deaf in its West Hartford, Connecticut office with full back pay and fringe benefits, as well as compensatory damages for psychological and emotional damage and distress, humiliation, and pain and suffering. He also seeks punitive damages for the wanton and intentional violation of his rights by defendant.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter under 42 U.S.C. §§ 1988, 2000e-5(f)(1) and 12117, and under 28 U.S.C. §§ 1331 and 1343(4).

3. The request by Plaintiff for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202.

4. All conditions precedent to the filing of this action have been met by Plaintiff, in that Plaintiff filed a timely charge of disability discrimination with the Connecticut Commission on Human Rights and Opportunities (hereinafter "CHRO") on January 24, 2003, and the CHRO filed said charge with the Equal Employment Opportunity Commission (hereinafter "EEOC") as part of the CHRO's dual processing procedures.

5. The EEOC issued a Notice of Right to Sue letter (copy attached), which the Plaintiff received on or about January 5, 2005.

6. The CHRO issued a Release of Jurisdiction (copy attached), which the Plaintiff received on or about January 5, 2005.

7. Plaintiff brings this action within ninety (90) days of his receipt of the Notice of Right to Sue.

8. Plaintiff brings this action within ninety (90) days of his receipt of the Release of Jurisdiction.

9. Venue is proper in the United States District Court for the District of Connecticut, in that all of the parties reside and/or do business within this district, and the events that gave rise to this cause occurred within this district.

## PARTIES

10. Plaintiff WALTER GIBBS is an individual with a disability (deaf from birth) and resides in Waterbury, Connecticut.

11. Defendant AMERICAN SCHOOL FOR THE DEAF is a business located in West Hartford, Connecticut.

## FACTS

12. The Plaintiff's race and color are black.

13. The Plaintiff is deaf from birth and his native language is American Sign Language (hereinafter "ASL").

14. The Plaintiff comes from a "deaf culture," which means that he has grown up in a deaf environment, and his entire life, upbringing and education was within that environment with no opportunity to participate in a "hearing environment."

15. The Plaintiff was employed by defendant on or about August 12, 1999, as a Community Inclusion Specialist.

16. Defendant employs more than 20 persons.

17. At the time of his hiring, the Plaintiff's supervisor was Susan Shatney (hereinafter "Ms. Shatney").

18. Ms. Shatney is Caucasian and proficient in ASL.

19. Ms. Shatney was aware that the Plaintiff came from a deaf culture and made every effort to communicate clearly and understand the Plaintiff.

20. Ms. Shatney was always satisfied with the Plaintiff's work performance.

21. In 2001, Ms. Shatney resigned from her employment with defendant.

22. In Ms. Shatney's stead, defendant hired Christopher Reynolds (hereinafter, "Mr. Reynolds").

23. From 2001 until his termination, Mr. Reynolds was the Plaintiff's immediate supervisor.

24. Mr. Reynolds is Caucasian.

25. Mr. Reynolds cannot communicate in ASL, and instead he uses English sign language, which is a direct translation from spoken English.

26. Unlike English sign language, ASL is completely unrelated to spoken English.

27. Mr. Reynolds came from a "hearing culture," not a "deaf culture," and could communicate verbally.

28. Mr. Reynolds is not familiar with the "deaf culture."

29. Mr. Reynolds should have been trained in ASL and in associating with culturally deaf people.

30. However, this training was not required or made mandatory by defendant.

31. As a result, Mr. Reynolds never underwent any training in ASL or associating with the culturally deaf.

32. Such training was important not only for communicating with co-workers, but also for communicating with defendant's clients, most of who are from the "deaf culture" and communicate through partial broken ASL or MSL (minimal language skills) such as the client assigned to the Plaintiff, Jason Maxwell.

33. Defendant, therefore, knew or should have known that hiring Mr. Reynolds without mandating such training would prevent him from properly and effectively communicating with co-workers and clients.

34. Moreover, unlike Ms. Shatney, Mr. Reynolds never took the time to ensure that he communicated clearly with the Plaintiff.

35. Furthermore, communications between Mr. Reynolds and the Plaintiff were greatly frustrated by Mr. Reynolds inability to use ASL.

36. The Plaintiff and Mr. Reynolds had lots of problems communicating, usually requiring the Plaintiff to repeat signs multiple times to have Mr. Reynolds understand him.

37. Most of the time the Plaintiff could not understand Mr. Reynolds and only had a vague idea of what Mr. Reynolds was communicating to him.

38. Additionally, on many occasions, Mr. Reynolds would use sign language with other employees, but upon seeing the Plaintiff approach would switch to using his voice.

39. Such action on the part of Mr. Reynolds created a hostile work environment, in which the Plaintiff felt helpless and offended.

40. Meanwhile, on one occasion, Mr. Reynolds made a remark to the Plaintiff insinuating that the Plaintiff lived in the projects because he was black.

41. Upon information and belief, the Plaintiff was the only black person employed by defendant within his department at that time.

42. Upon information and belief, other black employees within defendant's employ had previously filed race and color discrimination claims with the CHRO in reference to hiring, promotion, termination and compensation.

43. All of the Plaintiff's performance ratings were satisfactory, including that of June 2002.

44. On or about June 19, 2002, the Plaintiff was suspended due to an alleged complaint made by one of defendant's clients, Jason Maxwell (hereinafter "Jason").

45. Allegedly, Jason communicated to Mr. Reynolds that the Plaintiff took Jason against his will to a casino.

46. Jason, among other things, is deaf, is from the "deaf culture" in which he has spent his entire life, and communicates only in a very limited form of ASL.

47. The Plaintiff had worked with Jason for several years prior to this without incident or complaint.

48. However, in a written summary of Jason's allegations, Mr. Reynolds purported on the basis of his limited understanding of Jason, that Jason communicated to him an extremely serious complaint against the Plaintiff for willful client abuse, false imprisonment, kidnapping, reckless mismanagement of a client's program and fraud.

49. The Plaintiff contested these accusations and was reinstated on June 26, 2002, after defendant concluded that the accusations were unfounded.

50. Despite this, in a lengthy memo from Mr. Reynolds, the Plaintiff was told that he, and he alone, would have to follow five completely new and additional rules of operating procedure while in defendant's employ. These new rules never before applied to the Plaintiff, and never applied to any other employee working for defendant.

51. Additionally, Mr. Reynolds' memo, while praising the Plaintiff's work performance, threatened the Plaintiff with termination.

6

52. On or about August 17, 2002, after having received authorization from the Defendant and in conformity with the five new rules from Mr. Reynolds, the Plaintiff and Jason traveled to New York City.

53. At some point thereafter, Mr. Reynolds alleged that Jason informed him that two other employees of defendant accompanied the Plaintiff and Jason to New York City without authorization from defendant.

54. These allegations were similarly unfounded and not credible.

55. On or about September 13, 2002, defendant interviewed the Plaintiff in regards to the accusations.

56. The Plaintiff informed defendant at that interview that he and Jason traveled to New York City alone and that the accusations were false.

57. Given these concocted accusations, the fact that Mr. Reynolds was once again the receiver of a false complaint, Mr. Reynolds' previous discriminatory remarks, the hostile environment created by Mr. Reynolds and Mr. Reynolds refusal to communicate with the Plaintiff, the Plaintiff made a complaint with defendant regarding Mr. Reynolds for what he felt at the time was race discrimination.

58. Ms. Terri Davenport (hereinafter "Ms. Davenport"), Defendant's Director of Human Services, received the complaint.

59. The Plaintiff specifically told Ms. Davenport that he believed Mr. Reynolds subjected the plaintiff to adversely differential treatment, as compared to other co-workers, because of the Plaintiff's race and color.

60. On or before September 18, 2002, Mr. Reynolds was informed of the Plaintiff's complaint against him.

61. In retaliation for the Plaintiff's complaint, on or about September 27, 2002, Mr. Reynolds wrote a four-page letter, stating that the Plaintiff was a terrible worker.

62. This letter contradicted Mr. Reynolds' previous remarks from his earlier memo to the Plaintiff and all of the performance evaluations the Plaintiff received during his employ with defendant.

63. The letter also stated that Mr. Reynolds could no longer work with the Plaintiff.

64. On or about October 29, 2002, the Defendant terminated the Plaintiff's employment.

65. The termination was a direct result of Mr. Reynolds' inability to communicate with the Plaintiff, Mr. Reynolds' discrimination against the Plaintiff due to the Plaintiff's disability, race and color, and Mr. Reynolds' aforementioned retaliatory letter.

66. The Defendant selected to terminate the Plaintiff's employment rather than to properly train Mr. Reynolds in ASL and in communicating with people from the "deaf culture"

67. By hiring Mr. Reynolds to replace Ms. Shatney, the Defendant violated the Plaintiff's civil rights, discriminated against the Plaintiff and ensured the Plaintiff's termination.

68. Defendant terminated the Plaintiff because of his physical disability, race, color, and opposition to defendant's discriminatory conduct.

## CAUSES OF ACTION

*Count One: Violations of Title VII of the Civil Rights Act of 1964*

69. Plaintiff repeats, reiterates and restates each and every allegation of the complaint herein marked and designated paragraphs ONE through SIXTY-EIGHT inclusive as though fully set forth herein.

70. The above discriminatory pattern and practice by defendant violated the Plaintiff's rights as protected by Title VII of the Civil Rights Act of 1964.

71. As a direct and proximate result of said acts, the Plaintiff suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and suffered and continues to suffer psychological pain and suffering, distress, humiliation, great expense, embarrassment, and damage to his reputation.

*Count Two: Violations of 42 USC § 1981*

72. Plaintiff repeats, reiterates and restates each and every allegation of the complaint herein marked and designated paragraphs ONE through SEVENTY-ONE inclusive as though fully set forth herein.

73. The above discriminatory pattern and practice by defendant violated the Plaintiff's rights as protected by 42 USC § 1981.

74. As a direct and proximate result of said acts, the Plaintiff suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and suffered and continues to suffer psychological pain and suffering, distress, humiliation, great expense, embarrassment, and damage to his reputation.

*Count Three: Violations of Title I of the Americans with Disabilities Act of 1990*

75. Plaintiff repeats, reiterates and restates each and every allegation of the complaint herein marked and designated paragraphs ONE through SEVENTY-FOUR inclusive as though fully set forth herein.

76. The above discriminatory pattern and practice by defendant violated the Plaintiff's rights as protected by Title I of the Americans with Disabilities Act of 1990.

77. As a direct and proximate result of said acts, the Plaintiff suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and suffered and continues to suffer psychological pain and suffering, distress, humiliation, great expense, embarrassment, and damage to his reputation.

*Count Four: Violation of Conn. Genn. Stat. §46a-60(a)(1) and (4)*

78. Plaintiff repeats, reiterates and restates each and every allegation of the complaint herein marked and designated paragraphs ONE through SEVENTY-SEVEN inclusive as though fully set forth herein.

79. The above discriminatory pattern and practice by defendant violated the Plaintiff's rights as protected by Conn. Gen. Stat. §46a-60(a)(1) and (4).

80. As a direct and proximate result of said acts, the Plaintiff suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and suffered and continues to suffer psychological pain and suffering, distress, humiliation, great expense, embarrassment, and damage to his reputation.

*Count Five: Intentional Infliction of Emotional Distress*

81. Plaintiff repeats, reiterates and restates each and every allegation of the complaint herein marked and designated paragraphs ONE through EIGHTY inclusive as though fully set forth herein.

82. The foregoing actions of defendant constitute intentional infliction of emotional distress upon the Plaintiff in that these acts are extreme and outrageous and that defendant knew or should have known that such acts would cause the Plaintiff to suffer severe emotional distress.

83. As a direct and proximate result of said acts, the Plaintiff suffered and continues to suffer severe physical and psychological injuries.

WHEREFORE, Plaintiff respectfully prays this Court:

(a) To order defendant to reinstate him to the position he held prior to his discriminatory discharge, pursuant to Title VII of the Civil Rights Act of 1964;

(b) To order defendant to reinstate him to the position he held prior to his discriminatory discharge, pursuant to 42 USC § 1981;

(c) To order defendant to reinstate him to the position he held prior to his discriminatory discharge, pursuant to Title I of the Americans with Disabilities Act of 1990;

(d) To order defendant to reinstate him to the position he held prior to his discriminatory discharge, pursuant to Conn. Gen. Stat. §§ 46a-60(a)(1) and (4) and 46a-104;

(e) To award him under Title VII of the Civil Rights Act of 1964 all the pay and employment benefits he lost as a result of defendant's unlawful discrimination against him;

(f) To award him under 42 U.S.C. § 1981 all the pay and employment benefits he lost as a result of defendant's unlawful discrimination against him;

(g) To award him under Title I of the Americans with Disabilities Act of 1990 all the pay and employment benefits he lost as a result of defendant's unlawful discrimination against him;

(h) To award him under Conn. Gen. Stat. §§ 46a-60(a)(1) and (4), and 46a-104 all the pay and employment benefits he lost as a result of defendant's unlawful discrimination against him;

(i) To award him, under Title VII of the Civil Rights Act of 1964, compensatory damages in the amount of $1,000,000.00;

(j) To award him, under Title VII of the Civil Rights Act of 1964, punitive damages in the amount of $2,000,000.00;

(k) To award him, under 42 U.S.C. § 1981, compensatory damages in the amount of $1,000,000.00;

(l) To award him, under 42 U.S.C. § 1981, punitive damages in the amount of $2,000,000.00;

(m) To award him, under Title I of the Americans with Disabilities Act of 1990, compensatory damages in the amount of $1,000,000.00;

(n) To award him, under Title I of the Americans with Disabilities Act of 1990, punitive damages in the amount of $2,000,000.00;

(o) To award him, under Conn. Gen. Stat. § 46a-104, compensatory damages in the amount of $1,000,000.00;

(p) To award him, under Conn. Gen. Stat. § 46a-104, punitive damages in the amount of $2,000,000.00;

(q) To award him compensatory damages at common law in the amount of $1,000,000.00;

(r) To award him punitive damages at common law in the amount of $2,000,000.00;

(s) To award him under 42 U.S.C. § 2000e-5(k) reasonable attorney's fees and costs of this action;

(t) To award him under 42 U.S.C. § 1988 reasonable attorney's fees, expert fees, and costs of this action;

(u) To award him under Conn. Gen. Stat. § 46a-104 reasonable attorney's fees, expert fees, and costs of this action;

(v) To award him such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Dated: Farmington, Connecticut
April 4, 2005

LUMELSKY & MOGILEVICH, LLP

by _____
Alexander Lumelsky, Esq.
Federal Bar No.: CT 23686
Attorneys for Plaintiff
270 Farmington Avenue, Suite 365
Farmington, Connecticut 06032
(860) 677-8960
fax (860) 677-8594